You may proceed. Thank you. Good afternoon, and may it please the Court. My name is Michelle Laird, and I represent the state government parties. I would like to reserve about five minutes for rebuttal. Okay. This appeal involves an amended judgment in favor of the Pauma Band of Mission Indians. The district court found that Pauma was entitled to rescission of its 2004 amended tribal state gaming compact based on a misrepresentation. And in addition, the district court awarded $36 million that Pauma had paid to the state in exchange for performances under the 2004 amended compact. The district court characterized its award as specific performance of the 1999 compact that the parties were parties to prior to the 2004 compact. And the district court erred in reaching both of those determinations. To establish a misrepresentation, a court must find that an assertion of fact was made that it was not in accordance with a fact in existence at the time. Here, the district court found a misrepresentation occurred in December of 2003 when the gambling control commission communicated to the tribe that there were no more licenses in the license pool that was established by the 1999 compact. At that time, the commission administered the license pool as containing 32,151 licenses. The district court relied on two things to find that the commission misrepresented the size of the license pool in December of 2003. First, it found that the Colusa II court intended its expansion of the license pool to create a fact in existence throughout the 1999 compact. The district court relied on a passage in the opinion finding that there were, in quotes, 42,201 licenses in the pool. But the opinion, it uses both present and past tense throughout. And so that's really not a good indication of Colusa's intent. made what is now the final determination as to how many licenses should have been available in 2003, actually in 1999. Then doesn't that retroactively apply to establish the cap on the pool? And whether we label it as a mischaracterization or misrepresentation or a mistake of fact, isn't it true that it was material to Palma's decision to enter into the amendment because it was then negotiating to build a resort-style casino that required more machines? And that it should have been able to obtain an additional number of licenses in December of 2003 that the state didn't know were actually available? Well, to answer your first question, if you're referring to the doctrine of retroactivity, which the district court relied on in this case to find that the number applied retroactively, then that definitely doesn't apply in this case. Why not? If the court found there was an ambiguity, and I think both sides agree that it was ambiguous as to what the actual number was, why doesn't a later judicial resolution of that ambiguity relate back to the time of the contract? Well, the doctrine of retroactivity applies when a court interprets a federal statute or the U.S. Constitution, and it's applied to later cases that come up before the courts. Well, you're talking about that. I mean, that's because we're not interpreting a statute, and we're not. But we are saying what a contract means, aren't we? So I think because of the unique nature of the compacts and the unique nature of the Calusa cases, I think our position is that it doesn't create a fact in existence at the beginning of the contract. So you don't have any case authority? No, and neither does the tribe. On a misrepresentation claim, neither of the parties have presented the court with a case that says a misrepresentation creates a fact in existence for purposes of another contract. Let's assume that it was an innocent misrepresentation for purposes of my question. Why isn't that the same as mutual mistake of fact as to what the actual number was between both parties to the contract? It could be. Under certain circumstances, it could also be a mutual mistake of fact. But again, under the unique nature of the Calusa cases, in this instance, it's the State's position that it shouldn't be applied retroactively to provide PAMA with a misrepresentation claim. Well, if we disagree with you on that and we think it should apply retroactively, then how did the district court err in ordering rescission of the contract and, in essence, restitution? Although I agree with you, I don't think it's specific performance. You can't rescind a contract and then enforce it. But you can rescind a contract and order restitution to put the parties in the position status quo ante, can you not? Certainly, if the court finds that a misrepresentation occurred, PAMA would be entitled to rescission of its 0-4 amended compact. Of course, the remedy is a separate issue, which we've addressed separately in our briefs. Normally, restitution would flow from a rescission. But here we have the sovereign immunity of the State that protects it from that reward. I mean, we've got a statute, what is it, government code section 98005. And then we have paragraph 9.4 in the 1999 compact, which expressly waive sovereign immunity. So why should we not find that under the Supreme Court cases that there has been an express waiver, and therefore an exception to 11th Amendment immunity? Section 9.4 of the compact is a limited waiver, and it only provides for certain exclusive remedies. That's your interpretation? Yes, under the contract, yes. That is our interpretation. It provides for injunctive relief, declaratory relief, and specific performance. If that specific performance is requiring the parties to provide, in cases where there's payment in any event, to make a payment that's required under the compact. Here, the restitution is not a payment that's required. It's really a disguised restitutionary remedy, which is barred by Edelman v. Jordan. Why couldn't this be viewed as specific performance of the 1999 compact? Well, because the payments were made under the 04 compact, and there's no provision in the 99 compact that requires the state to pay the tribe. Well, if you undo the 2004 compact, you're left with the amount to be paid under the 1999 compact, aren't you? Well, the . . . Plus the $100 per slot machine. Yeah, so what the district court did here was it provided an offset to the tribe for the money that it would have paid under the 99 compact, and then is refunding to the tribe the $36 million. Right. So I'm just asking, why couldn't that be viewed as specific performance of the 1999 contract? Because there's no provision in the 99 compact or the 04 compact requiring the state to pay, refund any money to the tribe. And because this is . . . we're talking about a waiver. Well, you're enforcing the terms of that contract, aren't you? Well, when that money was paid, the parties weren't in the 99 compact. The money was paid for the exchange of performances under the 04 compact. Weren't they in the 99 compact as amended in 2004? Yeah. I mean, we're not dealing with two separate contracts here. There is. The amendment actually did away with the license pull provisions altogether. But that doesn't void the rest of the 1999 compact. If that were true, then the 9.4 waiver would be null and void as well. The 9.4 waiver carried over. It was not repealed. So the contract was amended. So we don't have two separate contracts here. We have an amendment in 2004 that relates back to the 1999 contract. That's true. But that shouldn't change the analysis of whether or not there's a provision in that compact, however you want to refer to it, that's being enforced by the restitutionary remedy. Now getting back to my question and mixing it with Judge Schroeder's question, why couldn't we view that as part of the equitable relief that the court awards when it rescinds the 2004 amendment and tries to restore the parties to the position status quo ante by declaring that the additional machines should be paid for at the 1999 rates rather than the higher 2004 rates? The reason is because there's no difference between that and what the court did in Edelman v. Jordan. It's simply labeling the restitutionary award as specific performance. I get your argument there. I'm concerned that Palma's better argument has to do with the statutory waiver because it provides for any cause of action arising out of the State's violation of the terms of any tribal state compact, any cause of action. Right, but the important language to focus on there is arising from a breach. There's been no claim that the State breached. No, no, it doesn't say breach. It says arising from the State's violation of the terms. Okay, well, I'm interpreting that as a breach. A violation is normally a breach of compact. Wouldn't the violation be the failure to make additional licenses available upon demand in December 2003, which were in fact available but for the mistake of the State? That brings us back to our original conversation, and I think it's important here to point out that the Colusa District Court had this exact claim before it. Colusa argued that when the Commission refused to hold draws in 2006 and 2007, that there was no breach because, in fact, the Commission was administering the pool using the 32151 number, and the District Court did not create its new number, which was modified in Colusa II until October of 2009. Yeah, but didn't Judge Damorell order a new draw in order to permit the Colusa tribe to obtain the additional licenses otherwise due and owing? He did, in fact, and in this case, if the court were to uphold the court's merits determination, PAMA would go back into the 99 Compact, and it could apply for licenses as well. There remain licenses in the pool. Would it be impermissible, in your view, for the court, as a matter of equity, to order a future credit for those new machines? I think that would also violate the principles of Edelman v. Jordan and the other cases we cited. But it wouldn't be ordering the state to pay any money out of the general fund. It would simply say to the tribe, you have a $36 million credit here that may be applied to future licenses. Our view of that is that that would be simply a payment by the state over time, rather than a lump sum payment. What's the state paying? It's a cessation in the amount of revenue that the state would otherwise receive, but the state isn't drawing any money out of the general fund that it has to pay over to the tribe. Well, there's no authority for providing a credit either. Well, we're talking equity here. I mean, the court has inherent equitable power to try and restore the parties to the position they would have been in, but for the error. And I'm wondering, why not? Why can't a district court order that? Again, I think our view is that it's simply another way of disguising what is a barred restitutionary remedy. You know, I'm a little puzzled by the argument that we're limited to those remedies that are spelled out in the compact waiver of sovereign immunity because it would seem to me in reading it that what was meant was to preserve immunity against an award of money damages and that you wouldn't have to spell out every kind of equitable relief. Assuming you're right that you call it restitution and not specific performance, and it's restitution of money, what would be the point of interpreting it that way? What would be the point? Why shouldn't we just interpret it as preserving immunity from money damages but waiving immunity for specific equitable remedies? Well, the terms of the compact were negotiated in 1999 between the parties. They agreed to those terms. They spell out specifically. The question is, what do they mean? Does it mean that only those particular remedies that are named are immunities being waived for? Shouldn't it include other equitable remedies following the line of demarcation that the Supreme Court laid out in Bowen? I think that because we're talking about governmental sovereign immunity, the exclusive waiver clauses should be construed in a limited way and only provide for remedies that the parties themselves negotiated might be available for breach or what have you. In this case, again, it's—and I see I'm down to five minutes. Can I continue, Elise? If you can answer the question. Yeah, I'll just answer the question. So the 1990 compact, as I stated, provides for only declaratory relief, injunctive relief, and specific performance. Yeah, you don't read the two clauses together. That's correct, Your Honor. Okay. Thank you. Thank you, Ms. Laird. Ms. Williams, go ahead. May it please the Court, Cheryl Williams on behalf of the PAMA Band of Mission Indians. At council table with me today is my partner, Kevin Cochran. I ask that the panel affirm the precision and specific performance awards granted by the district courts and find that the state negotiated the 2004 amendment in bad faith and thereby triggered the IGRA remedial process. Well, the district court didn't find that the state— No, I'm asking you to find it. All right, okay. I just want to make sure we're clear on what the district court said. A central purpose behind the Indian Gaming Regulatory Act, or IGRA, is to restrain aggression from powerful states during compact negotiations. During the RINCON 2 oral argument, Judge Milan Smith scoffed at the idea of equal sovereigns when the state argued that general fund revenue sharing is not a tax simply because it's bargained for. But RINCON was a different situation. RINCON was a case where the state and the tribe were unable to agree on the terms of a 2004 amendment because the tribe resisted the state's demand for what the tribe thought were taxes in the form of higher fees for the machines. Here the parties actually consummated an agreement. However, the problem is, as I understand your position, they did so with a very different view as to how many licenses should be available. And I think that's a factual distinction that makes a difference. Correct, Your Honor. That's actually the point that I was getting to, was that the fees are the same. There's 15% in RINCON. And in PAMA, we have 13% into the general fund and 4.5% into the RSTN. No, you're missing the point of my question. No, I know. I'm getting there. If you'll bear with me for a second. All right. The point is that the fees are very similar, but equitably they will be in very different places, that RINCON will get a compact drafted by the Assistant Secretary of Indian Affairs and PAMA will just return to its old agreement with only five years remaining on its term. So that's the point I was getting to. There's actually more harm to PAMA than there was to RINCON. But I thought you were signing RINCON for your bad faith argument. That's what I'm addressing. Right. And I'm suggesting to you that I don't think RINCON controls our facts on the bad faith issue at all. I think that the facts are so distinguishable because here we have a contract, there they did not. And the specific bad faith was with regard to the manner in which the state was conducting its contract negotiations with the RINCON tribe. Right. But if you look at the reason that that happened, there's an equitable – I mean, what you're asking for is reformation of the contract. But as I read the restatement of contracts, the only time a court can order reformation is if there's actually fraudulent misrepresentation. And quite frankly, I don't see that here with the ambiguity in the terms of the 1999 compact. Nobody had any idea until we finally settled the question in 2010 how many licenses were actually available. Your Honor, the primary remedy that we are seeking here is the IGRA remedial process. Like I said, the tribe has five years remaining on its compact. So even if you rescind the 2004 amendment, they're not back where they were in 2004. They've only got five years left, and that's not even time to re-litigate a bad faith suit if the parties started anew. I hear your argument, but what you are asking us to do is to reform the term, the length, of the 1999 compact and give you another 10 years. Well, that's our fallback position. Our primary request is – The district court gave you the additional machines at the 1999 compact rates and ordered a $36 million return of the excess money that was paid. And now you're asking us for another 10 years on the contract at the 1999 rates. That's not the deal that the state entered into in 1999. Right, but PAMA did not get those years. They did not get the rights to 2,000 machines at the 1999 compact rates. They got the machines that they got, and they made a significant amount of money off of them, and then the district court is giving you the difference in the rates. That's a pretty significant effort to restore your party to the position that it was in. Their expansion plan fell apart because they were not able to get this deal together. Well, the expansion plan fell apart because the party that you were negotiating with merged with the entity that was running the Rincon Casino seven miles down the road, and that party wasn't going to set up a competing casino seven miles away. So you can't blame the state for that one. Well, it happened six months down the road because they had to enter into this negotiation process when they couldn't get the licenses in December of 2003. But that aside, they've been stuck at 1050 machines since that time, and they need some certainty in order to get funding to expand, and it has hampered their development. All the tribes up along the Highway 79, they're all at 2,000 machines in a permanent structure, and Palma is still in a temporary tent structure at 1050 machines, and the state still maintains that Palma cannot draw additional licenses under the 1999 compact terms, and that's been their position all along while the injunction was pending. So you see, there is a harm here to the tribe that is not being addressed with simple rescission. So are you saying no additional licenses have been made since we ruled in 2010 that the limit was higher? No, Your Honor. The state maintains that Palma cannot draw additional licenses from the 1999 compact pool, and they maintain that today. I'm still struggling with whether it's a misrepresentation to interpret a contract differently than a court does many years later. And in that regard, I find persuasive the Curtin v. United Airlines case from D.C. Circuit Court of Appeals. Why shouldn't I find that persuasive? United Airlines relied on well-settled law in describing their baggage claim liability limits to their customers. And the well-settled law at the time was the only Ninth Circuit authority interpreting the Warsaw Convention as well as Department of Transportation guidelines. So they did not make a false statement in describing the law of the land to their customers, whereas the CGCC did not rely on any well-settled authority. But they interpreted it differently than the court ultimately did, just like they interpreted it, just like the State interpreted it differently than ultimately did the Ninth Circuit in Colusa. Right. But they made their own unilateral interpretation without any guidance from any legal authority whatsoever, and they knew that they were, they admitted that they were a quasi-trustee of the pool, and yet they did not, they even admitted that they did not have the power to alter or amend the compacts. And Judge Damrelle. No, but they had to interpret it. And everybody, and when you're in a contract dispute, you interpret it one way, your opponent interprets it another way. The Court has the ultimate decision. But the question is, you know, whether it's a misrepresentation to have a different opinion about the interpretation of the contract when you interpret it earlier on in the proceeding. Well, Judge Damrelle said in the Colusa I decision said that they did not have the control to their own self-interested number in order to induce the tribes back to the renegotiation table. And now Palma gets a remedy that nobody else got in Colusa, despite the fact that the Colusa decision is entirely the basis for Palma's recovery. Why is that fair, or should we just not have to worry about that? In Colusa, the tribe there was making a claim for a different breach than we are discussing here. There, they claimed to have a different breach. But it's the exact same harm, meaning it's the State's representation that there was 32,000 licenses when the Court ultimately determined there was 40. It seems to me they suffered the same harm in that they were both told there was 32,000 licenses. True, Your Honor. But they based their breach of contract claim on the fact that the CGCC did not conduct the draws when they requested them. And the draws were much later, in 2006 and 2007. So the problem there was that they couldn't present any evidence showing how many draws would have been made and how many licenses should have been available at that time, whereas Palma was at the counter in December of 2003 when the pool became depleted for the very first time. And so we now know that there should have been enough licenses at that time. And the breach here is based on the depletion of the pool and the failure to listen, I mean the failure to issue the requested licenses. So there's two different breaches. It's a different factual situation, actually, when you're looking at just the breach. But I did want to go back to the primary remedy that we were asking is for the IGRA remedial process, which is basically court-ordered mediation, and then ultimately a mediator picks the compact that best comports with the statutes. And only if that doesn't occur, then the Assistant Secretary of Indian Affairs drafts the gaming regulations for the parties. The problem, though, is that you have a compact. You don't like the terms of it. You want to change it. But as I read the IGRA statute, it only applies if the state wrongfully refuses to enter into One element is that you have to have not entered into a compact. And here we have one. Right. But with rescission in hand, legally, that amendment no longer exists. Well, the amendment, but there is a compact. And that gets back to the discussion you and I were having about whether, or maybe I was having it with Ms. Laird, as to whether or not the 2004 amendment was just an amendment that changes some of the terms of the 1999 compact or a brand-new contract. Well, RINCON did have the 1999 compact as well, and that's what PAMA would have after rescission. So after rescission, they are in the same situation, except the harm to PAMA is much greater. Well, let me ask you this, Ms. Williams. Has your client attempted to negotiate with the state? Yes, it has, Your Honor. We did have two settlement conferences before the district court, and those, unfortunately, did not go anywhere. And we have had a couple subsequent discussions since that point, but the parties can't even seem to agree as to what they're negotiating about. That's the most, I guess, I can say about it. So you would like us to order mediation? Pursuant to the statute. Okay. And I do believe that we have presented evidence of the state's bad faith, and I would like to briefly review that, if I may. The second element of a prima facie case is that the state did not respond to a negotiation request in good faith. And in the 1999 compact negotiations, the state made a 25 percent revenue-sharing demand after the Proposition 5 compact was struck down in the Heer v. Davis case. And a state's counsel in the Rincon oral argument acknowledged if the state was not able to get 25 percent directly, it was going to find another way to do it. And instead, they created the complex license pool formula that it presented at the last moment after tribes balked at the 25 percent figure. Are we going back to the original negotiations for the 1999 compact? I'm confused. Right. I'm telling the story, if you'll bear with me.  All right. We're going to go back to the history. All right. But aside from the Legislative Analyst's Office, none of the state actors, if you'll read their documents, none of them actually tried to figure out what the license pool formula meant. They just said, let's pick the lowest-end number so that we can re-trigger renegotiations and start over. So it was actually the state that had buyer's remorse from the 1999 compacts. But all these state actors, they did acknowledge that a trustee was overseeing the pool. And we have documents from William Norris in December 1999 to the Legislative Analyst's Office referring to a neutral trustee overseeing the pool, as well as officers of the CGCC referring to the pool trustee. And yet, Calusa 2 tells us that the CGCC unreasonably interpreted the pool, and they refused to apply any of the canons of construction, and they disavowed the trustee status that it admitted it held. They also withheld private documents that showed the second element of the formula, and that's at SCR 328, Section 4. The second element of the formula should account for all the compact tribes, and that would have made it consistent with Calusa 2's interpretation. And they kept the inputs of the license pool confidential and made a material misrepresentation to PAMA that the pool was empty. I'd also like to address the sovereign immunity argument. Just to clarify, the limited waiver in Section 9.4a is just one way that PAMA can obtain its specific performance award. As Judge Tallman correctly noted, the government code applies to any action asserting any cause of action arising from the state's violation of the terms of any tribal state compact. The California Supreme Court in here versus Davis has broadly construed that as applying to claims arising from the negotiation, amendment, and performance of compacts. There is also a waiver by the state's litigation conduct, which I'd like to detail briefly. In the summer of 2009, when we first raised the issue of restitution, the governor's office threatened that they would seek disgorgement of PAMA's profits. So they interpreted the waiver as being, as allowing for equitable payments of some sort or another. The parties briefed a motion to dismiss, wherein the state did not raise a sovereign immunity defense. We briefed the injunction motion. Again, the state did not raise the defense. In April of 2010, Judge Burns issued his injunction order, and again, the state did not raise the defense. Even, I'm sorry, they appealed that order, and they did not raise the defense on the appeal, even though Judge Burns stated in the order that restitution would be available to PAMA if the tribe prevailed. It was only after we were remanded, Judge Burns ordered PAMA to file a lone summary judgment motion and said the writing was on the wall. The state finally raised sovereign immunity, and that was roughly 18 months into the case in March of 2011. And the trial judge said it doesn't matter when it was filed because it's jurisdictional. What do you say about that? That it's late. I mean, it's just like subject matter jurisdiction could be, you know, could be questioned now. I disagree with that statement, Your Honor. Judge Tallman himself presided on a panel in Ray Bleemeister that found that the State of Arizona had waived the immunity by litigation, by raising it late in the case after the court . . . I thought the Supreme Court said in one of the cases I read in preparation, I don't have it at my fingertip, that Eleventh Amendment immunity can be raised even in the Supreme Court of the United States if it's never been raised before for just the reason that I'm suggesting, because it goes to subject matter jurisdiction. I'm not sure which opinion you're referring to, Your Honor, but I did rely on your opinion in Ray Bleemeister's case. As much as I appreciate your reliance on my opinion, I'm afraid the Supreme Court gets the last word on that point. If I could also address the waiver in Section 9.4a. The State has conceded that it is bilateral, that either party is allowed for a payment, an enforcement of a payment provision, and the only circumstance in which PAMA could receive a payment is a refund of overpayments. And I do believe that a specific performance falls within that waiver. What are we specifically performing? And I want you to be as specific as you can be in that answer. What provision of the compact are we specifically performing? The State says there's no provision for the State to make payments like there was in the Bowen Supreme Court decision. What do you say? I would say that Restatement Second of Contracts, Section 357, says that specific performance is intended to affect the performance that would have been due under the contract. So essentially we're just trying to recreate an equitable adjustment of the performance between the parties had the contract been carried out from 2004. Well, in this case, how would you then distinguish that from just simple breach of contract sort of compensatory damages? Well, in that case, for example, if we were saying we didn't get the widgets that we were going to use and we had consequential damages flowing from that, that would certainly be distinguishable from an equitable payment. The specific performance, for example, in Bowen was that the Secretary of Health and Human Services had to reimburse the State for Medicaid expenditures. It was that simple. There was a very specific statutory obligation and it was simply enforced. What specific provision of the compact are we specifically performing here? Like I said, the Restatement tells us that specific performance does include the equitable adjustment of performance so that payments can be due as well as overpayments. But, as I mentioned, we don't even need the compact waiver because we have the government code waiver as well as waiver by litigation, although Judge Tallman disagrees with me. Actually, the Supreme Court disagrees with both of us. How's that? I wanted to just address a couple things. Another issue, the District Court refused to acknowledge the dwindling value of simple rescission, which would have PAMA with no compact at all. And I believe this is inconsistent with the purposes of IGRA. So we do request a bad faith finding under the statute. Those claims were never heard by the District Court. We were sort of caught in a catch-22 where the State argued at the beginning of the case that we couldn't make a claim because we had concluded a compact and then after rescission we were told, well, you can't get that because you didn't ask for it before. So it didn't really matter how we styled the claims that we were not able to get them heard. And Judge Battaglia did hold that those claims passed muster on a motion to dismiss early in the case. And it's my understanding that's how the process usually works is that you're allowed to make deficiencies in your claim and then you're allowed to amend your complaint to fix those deficiencies. And that simply didn't happen here. We were in a procedural morass where we were ordered to file a summary judgment motion. Then the case was transferred to another judge. We waited six months. The judge came in. And then we had to start over again, brief summary judgment motion. I mean, we did this process three times. And we really never had a chance to amend and get those claims heard. And that would be an inequitable result. Any further questions? Thank you very much. Thank you. The State has about five minutes left. Four minutes and 39 seconds. Would you give us 30 seconds to a minute on your offset issue, this net slot win issue? Oh, yes. $16 million. It seems to be a big deal. So if this court finds that rescission and reformation, I'm sorry, restitution are available, then along with restitution normally comes an offset for the benefits that were provided by the other party during the term of the compact that was rescinded. But why would that be so here? The difference, as I understand it, is simply between the 1999 rate and the 2004 amendment rates. That's the $36 million. The fact that the tribe made profits off the machines doesn't seem to me to be something that would otherwise inerr to the benefit of the State. That would simply be profit that the tribe got to keep from the operation of the machine. Well, certainly would not. Again, this goes back to the uniqueness of the Calusa decisions and how they came about. But in reality, PAMA would not have been able to add those devices had it not entered into the 04 compact. It would have had to wait until the prospective relief that was provided from Judge Damrell was given in October of 2009. PAMA added devices in, I believe, 06, 07, and 08. And that's when they made the money, again, based on the exchange of performances in the 04 compact. So there should be an offset if the matter is remanded for determination on the institution based on the ______. They wouldn't have been able to add devices even if in 1999 the total pool was the 40,000? I mean, if we go back in time and sort of make up a fantasy of what actually happened at the time, if those devices were in the pool and if they had applied for them, and I don't know that they would have gotten all of those devices in the December draw, but probably within a couple of years they would have, then they probably would have made the same amount of money. It's speculation, however, to say that. Well, I mean, the problem that the district court has when it is trying to do something non-protonque is it has to try and put the parties back in a position that they would have been in but for the mistake. So by definition, there's a little bit of Ouija board equity going on here. But assuming that they had obtained, let's say, an extra 100 licenses in 1999 at the 1999 rates, they would have operated those machines and made profits off of them, and the state wouldn't have had any entitlement or claim to those profits, would they? That's true. But, again, I have to go back to what happened in Colusa. The district court in that case found that there was no violation or breach, rather, when the commission was administrating the pool using the 32151 number. Those licenses would not have been available to Palmer at that time. They would have been available in October of 2009 had the tribe stayed in the 99 compact, and I haven't thought this out entirely, but perhaps that is a way that this court could restore the status quo and place Palmer in the same position that the other tribes who got the advantage of the Colusa II decision were in in October of 2009. Well, I mean, to some extent, I think this issue came up before the last district judge, actually, whose judgment we're reviewing, when she said, look, I can't decide these claims with respect to parties who are not before me. What I'm trying to do is to figure out how best I can put Palmer and the state back in the position they would have been in, and it may very well be that Palmer ends up getting a better result, but they're the party to the litigation. This isn't a class action on behalf of all the gaming tribes in the state. So . . . I mean, our position is that that would be an inequitable result in this case, given that the . . . Not as between the parties before the court. We're not the sovereign here. We are the judiciary. We're interpreting a contract. A district judge has determined that the contract needed to be rescinded, and the And again, as an alternative potential remedy, I suggest perhaps the court can go back to October of 2009 and do some kind of a partial . . . Maybe it's a partial rescission to that time frame, and that might resolve the problem that we're talking about here. Okay. Well, thank you both. We will do our best to work our way through. Always hard to unring a bell. Thank you. We stand adjourned.
judges: Jarvey, Schroeder, Tallman